Harry P. PILLING; Christine M. Pilling, Plaintiffs–Appellees,

v.

VIRGINIA PROPERTY & CASUALTY, Defendant–Appellant,

The Travelers Indemnity Company; Defendant.

No. 01–5176.

United States Court of Appeals, Sixth Circuit.

March 24, 2004.

Before RYAN and BATCHELDER, Circuit Judges; and TARNOW, District Judge.*

BATCHELDER, Circuit Judge.

Virginia Property & Casualty Insurance Guaranty Association ("Virginia Fund"), substituted as a party in interest for Reliance Insurance Co. ("Reliance"), brings this appeal challenging the district court's order of summary judgment finding that Reliance was the primary insurer of Harry and Christine Pilling ("Pillings"). Because the district court did not err in interpreting the insurance contracts, and because the substitution of the Virginia Fund does not alter the priority of the insurance policies in question, we affirm the decision of the district court.

## I.

On May 3, 1997, Kenneth Charles drove his pickup truck the wrong way on I–64 near Louisville, Kentucky, and collided head-on with a tractor trailer driven by the Pillings. Mr. Charles and his passengers were killed, the Pillings tractor trailer was destroyed, and the Pillings sustained serious physical and mental injuries.

Because the Pillings anticipated that their damages would exceed the $100,000 policy maximum which they had already received from the tortfeasor's insurer (USAA), they initiated an action in Kentucky state court seeking, *inter alia,* a declaratory judgment establishing the UIM coverage levels provided under insurance policies issued to their carrier-lessee by Travelers Indemnity Co. ("Travelers") and to the Pillings by Reliance, and the priority of the policies providing that UIM coverage. The action was removed to federal court by Travelers based on diversity of citizenship between the plaintiffs, who are residents of Virginia, and the defendants: Travelers, which is a Connecticut corporation, and Reliance, which was a Pennsylvania corporation. The district court found, and it is not challenged on appeal, that the Pillings were entitled to $750,000 in UIM coverage from Travelers based on a policy issued to the carrier-lessee of the Pillings' truck, and $1,000,000 in UIM coverage from Reliance for the Pillings' own policy on their truck. The district court also found, and it is not challenged on appeal, that these policies are non-stacking, and that the total which is due to the Pillings must be reduced by the $100,000 coverage from USAA, thereby leaving the Pillings with a total of $900,000 in potential UIM coverage from Travelers and Reliance.

The district court entered summary judgment finding Reliance to be the primary UIM insurer, and Travelers the excess UIM insurer. Three separate appeals were timely filed in this court: one by the Pillings (Case No. 01–5558), one by Travelers (Case No. 01–5559), and one by Reliance (Case No. 01–5176). While the appeals were pending, Reliance was declared insolvent by the Commonwealth Court of Pennsylvania, and this court issued a stay in light of the insolvency. We

---

* The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

subsequently granted the motion of Reliance to lift the stay and, pursuant to Fed. R.App. P. 43(b), to substitute Virginia Property & Casualty Insurance Guaranty Association ("Virginia Fund") for Reliance in all three pending cases, because the Virginia Fund had assumed Reliance's obligations. At the same time, we denied without prejudice the requests of the Pillings and Travelers to remand the case to the district court for that court's consideration of issues related to the Virginia Fund's assumption of Reliance's obligations.

On the eve of oral arguments, the Pillings and Travelers entered into a settlement and dismissed their respective actions (Nos. 01–5558 and 01–5559). Accordingly, all that remains before this court is the appeal originally filed by Reliance, for which the Virginia Fund has been properly substituted.

## II.

■ As an initial matter, we must determine whether this court retains jurisdiction after the substitution of the Virginia Fund for Reliance. Subject matter jurisdiction was predicated upon diversity of citizenship, however following the substitution of the Virginia Fund, a Virginia non-profit corporation, and the settlement by Travelers, the only remaining litigants are Virginia residents. Notwithstanding the Virginia Fund's objection to the contrary, it is well established that "diversity of citizenship is assessed at the time the action is filed," and subsequent action including substitution of parties does not defeat jurisdiction under 28 U.S.C. § 1332. *Freeport–McMoRan, Inc. v. K.N. Energy, Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991); *accord Napletana v. Hillsdale College*, 385 F.2d 871, 872 (6th Cir.1967) (noting that diversity of citizenship is determined at the time the complaint is filed). Because the parties were diverse at the time that this action was filed, this court retains subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

Accordingly, we will consider first whether the district court erred in finding Reliance's coverage primary to Travelers. We will then address whether the substitution of the Virginia Fund alters this determination.

## III.

We review de novo a district court order granting a motion for summary judgment. *Faughender v. City of North Olmsted*, 927 F.2d 909, 911 (6th Cir.1991). In determining which insurer is primary, the district court began by looking to the policies, which contain identical language identifying what coverage is deemed to be primary and what coverage is excess. Specifically, Section V(B)(5)(c) of the UIM coverage states "this Coverage Form provides primary insurance for any covered 'auto' you own and excess insurance for any covered 'auto' you don't own." The district court therefore found that under the terms of the contracts, the Reliance insurance policy obtained by the Pillings as owner of the truck was primary, and the Travelers insurance obtained by the carrier-lessee of the truck was excess.

The district court then examined whether the MCS–90 compliance statement—a form required by the United States Department of Transportation for carrier-lessees—which is attached as an endorsement to the Travelers policy altered this priority determination. The MCS–90 statement contains boxes the insurer may mark to designate the carrier's insurance as primary or excess. The MCS–90 form attached to the Travelers policy reflects that the "primary" coverage box was checked.

■ The court nonetheless found that the MCS–90 did not alter the priority in this case, because the MCS–90 endorsement addresses only "liability for negligence, and leaves 'all terms, conditions, and limitations' in the policy 'in full force.'" We think that the district court was correct. The MCS–90 form states in relevant part:

> The insurance policy to which this endorsement is attached provides automobile liability insurance.... In consideration of the premium stated in the policy to which this endorsement is attached, the Insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles [under the motor carrier act].... Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment.... However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company."

The MCS–90 form clearly states that it makes primary the carrier-lessee's insurance for judgments arising from the negligent operation of the vehicle, but otherwise leaves in full force and effect the insurance contract, including the contract's terms, conditions and limitations regarding UIM coverage. We find that the district court was correct in ruling that the insurance policy offered by Reliance is primary to the Travelers policy.

## IV.

Having concluded that the district court correctly determined that Reliance is the primary insurer, we next consider whether the substitution of the Virginia Fund alters that determination.

Following Reliance's insolvency, the Virginia Fund was substituted to fulfill Reliance's obligation. The Virginia Fund was formed as a non-profit organization to pay claims of insolvent insurers pursuant to the Virginia Property and Casualty Guaranty Association Act ("Guaranty Act"). Va.Code Ann. § 38.2–1600 *et seq.* The parties agree that the Virginia Guaranty Act is the appropriate law for determining the coverage questions arising from the Virginia Fund's substitution.

The Virginia Fund is not intended merely to "step into the shoes" of an insolvent insurer, *Virginia Property and Casualty Ins. Guar. Assoc. v. International Ins. Co.,* 238 Va. 702, 385 S.E.2d 614, 616 (1989). Rather, it is part of a unique legislative scheme to protect policyholders from the consequences of an insurer's insolvency by providing for limited payments from a fund maintained by fees paid by insurers who practice in that state.

The Virginia Fund asserts two significant restrictions relevant to the instant case: first, the Virginia Fund is obligated to pay only covered claims "not exceeding $300,000 per claimant." Va.Code Ann. § 38.2–1606(A)(1)(a)(ii). Because Mr. and Mrs. Pilling are both potential claimants, the fund's cumulative obligation cannot exceed $600,000. *See* Va.Code Ann. § 38.2–1603 (defining claimant as "any insured making a first party claim ....").

The second significant restriction on claims payable by the fund is an Exhaustion of Remedies provision, which states that:

> Any person having a claim against an insurer under any provision in an insurance policy ... shall be required to first seek recovery under the policy covered by the insurer which is not insolvent.

Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy.

Va.Code Ann. § 38.2–1610(A). The Virginia Fund argues that the Travelers policy, even if excess, is "any" provision in an insurance policy for the purposes of the exhaustion provision, and that therefore the Pillings must seek payment from Travelers before the Virginia Fund is obligated to make any payment. By focusing on "any provision in an insurance policy," however, the Virginia Fund misses the other key phrase: "Any person having a claim against an insurer." While the Virginia Supreme Court has not ruled on the application of this statute in a dispute between an excess insurer and the fund, the Virginia statute makes it clear that if a person has a claim against a solvent insurance company, he must seek recovery from that solvent insurance company before he can seek recovery from the Virginia Fund. *See id.* The pivotal question, then, is whether the Pillings "have a claim against a [solvent] insurer under any provision in an insurance policy." *Id.* In other words, the question is whether, given the insolvency of their primary insurer, the Pillings have a claim in the first instance against Travelers, their "excess insurance" carrier.

Virginia law provides that "the law of the place where an insurance contract is written and delivered controls issues as to its coverage." *Buchanan v. Doe,* 246 Va. 67, 431 S.E.2d 289, 291 (1993). In this case, the "excess insurance" policy underwritten by Travelers was written and delivered in Ohio. Accordingly, Virginia law directs this court to examine the law of Ohio to determine whether the Pillings have an available claim against Travelers. In other words, this court must determine whether, under Ohio law, an "excess insurance" policy provides primary coverage when an in-

sured's primary insurance carrier becomes insolvent.

The Travelers policy provides, in pertinent part: "Any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible uninsured motorists insurance providing coverage on a primary basis."

In *Revco D.S., Inc. v. Government Employees Ins. Co.,* 791 F.Supp. 1254 (N.D.Ohio 1991), the United States District Court for the Northern District of Ohio noted that, under Ohio law, excess insurers do not have a duty to "drop down" and assume coverage in the event of the insolvency of an underlying carrier unless, of course, the excess carrier expressly agrees to provide "drop down" coverage. The court explained:

> The two leading cases in Ohio on the drop down issue are: *Value City Inc. v. Integrity Ins. Co.,* ... 30 Ohio App.3d 274, 508 N.E.2d 184 [(1986)] and *Wurth v. Ideal Mut. Ins. Co.,* ... 34 Ohio App.3d 325, 518 N.E.2d 607 [(1987)]. The Court of Appeals for Warren County, in *Wurth,* provided a detailed discussion of the drop down issue and how such an issue is handled in the Ohio courts. The Court in that case indicated that cases from various jurisdictions addressing the issue have generally found drop down liability in one of several ways. First, some courts have found that, as a matter of public policy, excess insurers should be held liable to drop down in the event of insolvency of an underlying carrier. In *Wurth,* this public policy notion was rejected. The Court explained that:

> > [t]o adopt, due to public policy, a theory of "drop down" liability would fundamentally alter the risk an excess coverage provider is obligated to provide by agreeing to issue excess liability insurance protection. Therefore,

we hold "drop down" liability protection should not be judicially imposed on Ohio excess insurance providers as a matter of public policy.

The *Wurth* Court also noted that parties to an insurance agreement can enter into an express agreement whereby the excess liability insurer agrees to drop down and assume coverage in the event of the insolvency of an underlying carrier. The Court stated that "we recognize that the inclusion of specific policy language manifesting an agreement by the excess insurer to 'drop down' and become the primary insurer, due to the insolvency of the primary insurer, may be expressly written into an excess liability policy." In such an instance, the court would enforce the clear intention of the parties to the insurance agreement.

Finally, the *Wurth* Court noted that there may be instances in which insurance policies are ambiguous with respect to the drop down issue. The Court explained first, that if language in a policy is unambiguous, "the plain meaning ... [of such language] in an insurance policy should be enforced as written." If policy language is ambiguous, however, it should be construed against the insurer because the insurer "must accept responsibility for the wording chosen."

*Revco D.S., Inc. v. Gov't Employees Ins. Co.*, 791 F.Supp. 1254, 1265 (N.D.Ohio 1991) (internal citations and footnote omitted).

In *Wurth*, an excess insurer appealed the district court's holding that the insurer's liability " 'dropped down' and became primary coverage when [the insured's] actual primary insurer ... became insolvent." 518 N.E.2d at 610. The policy provided, *inter alia*, that "[t]he insurance afforded by this policy shall be excess insurance over any other valid and collect-ible insurance...." *Id.* at 611 (emphasis omitted).

The Ohio Court of Appeals stated:

It seems to us, by definition and long-standing principle, that an excess insurer is not generally liable for any part of the loss or damage which is covered by other insurance (be it collectible or uncollectible), but is liable only for the amount of loss or damage in excess of the coverage provided by all other applicable insurance policies.

*Id.* at 610. The court rejected the argument that the policy was ambiguous because it did not explicitly provide for the situation in which other insurance is valid but *uncollectible*, such as when a primary insurer becomes insolvent. *Id.* at 611–12. The court examined the entire contract and stated that the term " 'collectible' does not refer to the actual payment of a sum of money, but instead refers to the existence of other applicable insurance coverage based on the particular occurrence in question." *Id.* at 612. The court held that neither the insured nor persons injured by the insured had any right under the "excess insurance" policy "until [the insured's] underlying policy's limits were exhausted." *Id.* at 613.

■ In this case, the "excess insurance" policy does not contain an express agreement in which Travelers agreed to "drop down" and assume coverage in the event of the insolvency of the underlying carrier. Furthermore, the language of the policy is nearly identical to the language the Ohio Court of Appeals held to be unambiguous in *Wurth*. That language clearly states that the coverage provided by Travelers shall be *excess over* the coverage of the Pillings' primary insurance.

As Virginia law directs the application of Ohio law in this instance, and as the Pillings have no claim against Travelers under

Ohio law "until [their] underlying policy's limits [are] exhausted," *Wurth,* 518 N.E.2d at 613, the Pillings have no duty to seek recovery from Travelers before they seek recovery from the Virginia Fund.

## V.

We find that the substitution of the Virginia Fund, while altering the potential coverage required by the primary insurer, does not alter the priority of the insurers. The decision of the district court is therefore AFFIRMED, and the case REMANDED for proceedings consistent with this opinion.